IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                             No. 16-CR-0185-KG-1

JUAN MANUEL GOMEZ-HERNANDEZ,

       Defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER DENYING MOTION TO SUPPRESS

       This matter is before the Court on Defendant Juan Manuel Gomez-Hernandez's Motion to Suppress, filed on February 23, 2016.  (Doc. 18).  The United States filed a response on March 22, 2016.  (Doc. 26).

       On April 21, 2016, the Court held an evidentiary hearing on the motion to suppress. (Docs. 33-34).  Alexander Shapiro and Luis Martinez represented the United States, and Mary Stillinger represented Gomez-Hernandez, who was present.  At the conclusion of the hearing, the Court found, based on the totality of the circumstances, that the duration of the roadside stop was supported by reasonable suspicion and issued a preliminary oral ruling denying Gomez-Hernandez's motion.  (Tr.) at 141-42.[1]  The Court directed the United States to submit joint proposed findings of fact.  (*Id.*) at 142.  The Court finds and concludes for the reasons stated on the record that the motion to suppress is denied as to statements Gomez-Hernandez made about being in the United States illegally and other evidence derived therefrom.

---

[1] "Tr." refers to the transcript of the April 21, 2016, hearing on the motion to suppress.  (Doc. 34).

**FINDINGS OF FACT**

1.   The United States called two witnesses who testified in support of these factual findings:

New Mexico State Police ("NMSP") Officer Allan Benitez and United States Border Patrol

("USBP") Agent Anton Cesar.  Gomez-Hernandez did not call any witnesses.

  a.   Officer Benitez has worked as a NMSP patrol officer for approximately two

years and five months. (Tr.) at 13:14-22.  Prior to working as a patrol officer,

Officer Benitez attended a 22-week training at the NMSP Academy. (*Id*.)  Officer

Benitez is fluent in both English and Spanish.[2] (*Id*.) at 15:12-16.

  b.   Agent Cesar has been employed as an agent with USBP since October 2008. (*Id*.)

at 75:6-16. Throughout his tenure with USBP, Agent Cesar has been assigned to

the USBP duty station in Truth or Consequences, New Mexico. (*Id*.)

2.   Two exhibits were admitted into evidence without objection by either party:

  a.   Government Exhibit 1 is a DVD containing an approximately 1 hour and 22

minute video taken on October 28, 2015, by a dashboard camera affixed to

Officer Benitez's patrol vehicle. (*Id.*) at 8:24-9:13, 16:11-20.  The video

depicts the stop and detention of Gomez-Hernandez along with three other

individuals. (*Id*.)  The video includes a blinking timestamp in the lower right

corner of the video. *See* Gov't Ex. 1.  The video begins at the timestamp

"01:02:15PM." *Id*.  The video concludes at the timestamp "02:24:47PM." *Id*.

  b.   Government Exhibit 2 is a 50-page translation and transcript of the audio

portion of Government Exhibit 1. (Tr.) at 9:15-24.

---

[2] While Officer Benitez did not testify that he was fluent in English, his fluency in English was
clear from his testimony, which he presented in English.

3.     On October 28, 2015, Officer Benitez was on patrol traveling southbound on Interstate 25 (I-25) in Sierra County, New Mexico.  (*Id.*) at 17:12-18:4; Ex. 1 at 01:02:15 p.m.  At approximately 1:02 p.m., Officer Benitez observed a blue Ford Focus sedan traveling northbound on I-25 at a high rate of speed.  (Tr.) at 17:12-18:4; Ex. 1 at 01:02:36 p.m.  Using the radar equipment in his patrol car, Officer Benitez determined that the Ford Focus was traveling 87 miles per hour, 12 miles over the 75 mile-per-hour speed limit.  (Tr.) at 17:12-18:4.  Officer Benitez made a U-turn and began following the blue Ford Focus.  (*Id.*) at 18:12-16; Ex. 1 at 01:02:44 p.m.  Once he had caught up to the Ford Focus, Officer Benitez activated his emergency equipment.  (Tr.) at 18:12-16.

4.     At approximately 1:04 p.m., the Ford Focus slowed and stopped on the right shoulder of the northbound lanes of I-25 in the vicinity of mile marker 105.  (*Id.*) at 18:12-20; Ex. 1 at 01:03:55 p.m.  After parking behind the Ford Focus, Officer Benitez exited his patrol car and approached the passenger side of the Ford Focus.  (*Id.*) at 19:5-20:13; Ex. 1 at 01:04:11 p.m.  As he approached the Ford Focus, Officer Benitez observed a driver, ultimately identified as Alexis Granillo, and three passengers.  (Tr.) at 19:5-20:13.  The three passengers were ultimately identified as Alma Davila, seated in the front passenger seat; Cristhian Lopez-Carrasco, seated in the rear driver's side seat; and Gomez-Hernandez, seated in the rear passenger's side seat.  (*Id.*)

5.     Officer Benitez immediately observed that neither Gomez-Hernandez nor Lopez-Carrasco was wearing a seatbelt.[3]  (*Id.*) at 20:14-17.  Officer Benitez then addressed both Gomez-Hernandez and Lopez-Carrasco, asking if they were carrying identification cards.  (*Id.*) at 20:19-21:9; Ex. 1 at 01:04:25 p.m.; Ex. 2 at 2-3.

---

[3] Failing to wear a seatbelt while riding in a motor vehicle on any street or highway is a violation of NMSA 1978 § 66-7-372 (Cum. Supp. 2013).

6.    Officer Benitez provided Gomez-Hernandez and Lopez-Carrasco with a piece of paper and
      asked them both to write down their names and dates of birth.  (Tr.) at 20:24-21:14; Ex.
      1 at 01:05:06 p.m.; Ex. 2 at 2-3.  Gomez-Hernandez told Officer Benitez that he had
      an identification card from Colorado, but he did not have the card with him.  (*Id.*) at
      20:24-21:5; Ex. 1 at 01:05:25 p.m.; Ex. 2 at 3.  Lopez-Carrasco told Officer Benitez that
      he had a Texas identification card, but that he also did not have the card with him.  (Tr.) at
      21:6-9.

7.    Officer Benitez noticed that it took Lopez-Carrasco an unusually long time to write down
      his name and date of birth.  (*Id.*) at 21:15-22:1.  Officer Benitez also noticed that Lopez-
      Carrasco's hands were shaking, which Officer Benitez interpreted to be sign of nervousness.
      (*Id.*)

8.    As a result of his training, Officer Benitez decided that, based on both the number of
      occupants inside the Ford Focus as well as Lopez-Carrasco's apparent nervousness, it
      would be safer to separate Lopez-Carrasco from the other occupants of the Ford Focus.
      (*Id.*) at 22:15-23:16.

9.    At approximately 1:07 p.m., Officer Benitez asked Lopez-Carrasco to exit the Ford
      Focus. Ex. 1 at 01:06:50 p.m.; Ex. 2 at 3.  Lopez-Carrasco exited the rear driver's side
      door of the Ford Focus and followed Officer Benitez to Officer Benitez's patrol car.  Ex. 1
      at 01:06:58 p.m.  To ensure his own safety, Officer Benitez positioned Lopez-Carrasco on
      the passenger side of the patrol car with Lopez-Carrasco's hands on the hood of the patrol
      car.  (Tr.) at 23:17-24:16.  Officer Benitez observed that Lopez-Carrasco continued to
      behave in a nervous manner.  (*Id.*)   Officer Benitez also observed a tattoo on Lopez-
      Carrasco's face.  (*Id.*)

10. Officer Benitez testified that pursuant to his training, he is required to positively identify an individual before issuing that individual a citation. (*Id.*) at 14:9-15:11. Information from a positive identification, including name, date of birth, and address, is required to be listed on a citation. (*Id.*) Officer Benitez testified that courts rely on the identification listed on the citation to identify and to contact cited individuals. (*Id.*) Officer Benitez testified that the information required for a positive identification can be found on documents such as an individual's driver's license. (*Id.*) at 59:7-15. When Officer Benitez stops an individual who is not carrying identification documents, he can use the laptop computer in his patrol car to search databases for that individual's identifying information. (*Id.*) at 24:20-25:6, 59:7-15, 65:3-7. An officer can conduct a database search using the individual's name and date of birth or social security number. (*Id.*) at 65:3-7. Officer Benitez testified that this type of search also would return information that indicated whether an individual was wanted by law enforcement. (*Id.*) at 24:20-25:6. In Officer Benitez's experience, individuals who provide conflicting or incorrect identifying information during a traffic stop usually do so because they know that they are wanted by law enforcement. (*Id.*) at 14:23-15:3. Officer Benitez testified that, when he is unable to obtain a positive identification either from identification documents or his own database search, his last option is to run a database search using the individual's fingerprints. (*Id.*) at 15:1-11, 25:3-12. Officer Benitez testified that NMSP does not have the capability to perform fingerprint database searches and that such a search would be carried out at the Border Patrol station in Truth or Consequences. (*Id.*) at 25:7-15, 42:15-43:7, 64:17-24.

11.  Officer Benitez used the laptop computer in his patrol car to conduct a database query

using the identification information that Lopez-Carrasco had provided.  (*Id*.) at 23:17-

21.  The search failed to return any record of an individual with the name and date of

birth provided by Lopez-Carrasco.  (*Id*.)  Officer Benitez asked Lopez-Carrasco about his

Texas identification card:

| | |
|---|---|
| BENITEZ: | It is from Texas ...right?... From… from what part of Texas?… |
| LOPEZ: | From there from Presidio. . . |
| BENITEZ: | Presidio, Texas? . . . |
| LOPEZ: | ...[UI]...[UI]...[UI]...[UI]... |

(Tr.) at 25:23-25; Ex. 1 at 01:08:06 p.m.; Ex. 2 at 4-5.  Approximately a minute later,

during another exchange, Lopez-Carrasco stated that he had never had an identification

card:

| | |
|---|---|
| BENITEZ: | You said that you were going to have an ID from Texas … |
| LOPEZ: | No ...[UI]...[UI]...[UI]...[UI]... |
| BENITEZ: | Where was it from? … |
| LOPEZ: | ...[UI]...[UI]...[UI]...[UI]... |
| BENITEZ: | …what's that?… |
| LOPEZ: | ...[UI]...[UI]...[UI]...[UI]... |
| BENITEZ: | Where was the ID you had from? … |
| LOPEZ: | No ...[UI]...[UI]...[UI]...[UI]... |
| BENITEZ: | You have never had an ID? … |
| LOPEZ: | No ...[UI]...[UI]...[UI]...[UI]... |
| BENITEZ: | No?… How old are you? … |
| LOPEZ: | Twenty-two 22 … |
| BENITEZ: | You are twenty-two 22 years old and you have never gotten an ID … |
| LOPEZ: | ...[UI]...[UI]...[UI]...[UI]... |
| BENITEZ: | You have to be honest with me… What is going on there? ...[VO]... |

(Tr.) at 26:1-4. Ex. 1 at 01:09:22 p.m.; Ex. 2 at 5.  Approximately a minute later, Lopez-

Carrasco stated that he did not have a Social Security Number.  (Tr.) at 26:5-7;

Ex. 1 at 01:10:21p.m., Ex. 2 at 6.

12.  Based on Lopez-Carrasco's extreme nervousness, conflicting answers regarding possessing a Texas identification, and claim that he did not have a Social Security Number, Officer Benitez suspected that Lopez-Carrasco was attempting to conceal his identity either because he was on probation or because there was an active warrant out for his arrest.[4] (Tr.) at 26:8-13. Officer Benitez testified that at approximately 1:12 p.m., Lopez-Carrasco removed his hands from the patrol car and turned toward Officer Benitez in what he interpreted as an aggressive manner. (*Id.*) at 27:1-23. As a result, Officer Benitez radioed for backup. (*Id.*); Ex. 1 at 01:12:04; Ex. 2 at 7. Officer Benitez testified that he continued speaking to Lopez-Carrasco, urging him to be honest regarding his identity, and that Lopez-Carrasco eventually turned and put his hands back on the patrol car's hood. (Tr.) at 27:1-23.

13.  At approximately 1:16 p.m., dispatch contacted Officer Benitez and informed him that backup would arrive at his location in approximately ten minutes. Ex. 1 at 01:16:12; Ex. 2 at 12.

14.  Officer Benitez testified that, at some point during his contact with Lopez-Carrasco, he obtained a Mexican identification document from Lopez-Carrasco. (*Id.*) at 28:5-13, 60:3-24. Officer Benitez testified that he did not remember exactly when he obtained the Mexican identification. (*Id.*) at 28:5-13, 60:3-24. However, Officer Benitez testified that he obtained the Mexican identification before re-approaching the Ford Focus at 1:17 p.m. (*Id.*) at 27:24-29:4, 60:3-11.

---

[4] Pursuant to NMSA 1978, § 30-22-3 (Repl. Pamp. 2004), "[C]oncealing one's true name or identity . . . with [the] intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer . . . in a legal performance of his duty under the laws of the United States or [New Mexico]" is a crime.

15. After receiving the Mexican form of identification for Lopez-Carrasco, Officer Benitez

decided that he would re-approach the Ford Focus to see whether the occupants could

corroborate any of the identification information that Lopez-Carrasco had provided

regarding his identity.  (*Id.*) at 28:14-25.

16. At approximately 1:17 p.m., Officer Benitez told Lopez-Carrasco to remain at the  patrol

car.  (Tr.) at 28:21-29:4; Ex. 1 at 01:17:27 p.m.; Ex. 2 at 12.  Officer Benitez then  walked

back to the Ford Focus.  (*Id.*)

17. Upon returning to the Ford Focus, Officer Benitez spoke with Gomez-Hernandez.

(Tr.)  at 29:6-7.  Gomez-Hernandez told Officer Benitez that Lopez-Carrasco was a friend

and that he  and Lopez-Carrasco had met in Deming, New Mexico:

BENITEZ:        He … what is his relationship with you …   yours? …
DEFENDANT:    No… He is just a friend …
BENITEZ:        Friend?… yes? ...[UI]...[UI]...
DEFENDANT:    ...[UI]...[UI]...[UI]...[UI]...
BENITEZ:        ...oh!... you've got …well… I first want to know who he is… and
no ...[UI]...[UI]... Where did you meet him? …
DEFENDANT: No …well… he there ...that is to say... We are coming from
Deming …
BENITEZ:        You are coming from Deming… but …well… who… What
…what are you? ...[VO]... friends? ...[VO]...
DEFENDANT: ...[VO]... No …well… We just met there …well… Supposedly
we were going to work there… We were going to work in *el chile* but no… there
was no work . . .

(Tr.) at 29:6-16; Ex. 1, at 01:17:35; Ex. 2, at 12-13.  Gomez-Hernandez further stated

that he was a citizen and began providing Officer Benitez with a Social Security Number.

(*Id.*) at 29:21-30:4; Ex. 1, at 01:18:05p.m.; Ex. 2, at 13.

18. The driver, Granillo, told Officer Benitez that Lopez-Carrasco was a friend but that Granillo

did not know who Lopez-Carrasco was.  (Tr.) at 30:5-18; Ex. 1 at 01:18:32 p.m.; Ex. 2 at 14-

15.  Granillo stated that he and his three passengers were traveling to Albuquerque. *Id.*

Granillo stated that he did not know the reason for the trip and added that he was just helping his mother drive. *Id.*

19.  Davila told Officer Benitez that she and Granillo were driving to Albuquerque to visit her sister-in-law. (Tr.) at 30:21-24; Ex. 1 at 01:20:38 p.m.; Ex. 2 at 16. Davila further stated that they had "found [Gomez-Hernandez and Lopez-Carrasco] there on the road [in Hatch, New Mexico] and they asked [Davila] for a ride there." Ex. 1 at 01:20:38 p.m.; Ex. 2 at 16.

20.  At approximately 1:21 p.m., Officer Benitez walked back to his patrol car, contacted dispatch, and requested assistance from Border Patrol. (Tr.) at 31:11-12; Ex. 1 at 01:21:24 p.m.; Ex. 2 at 17. Officer Benitez testified that he decided to contact Border Patrol because he did not believe that Granillo and Davila were being truthful with him and he believed that the only way he would be able to positively identify Lopez-Carrasco, and therefore issue a citation, would be through fingerprint identification. (Tr.) at 31:14-20. Officer Benitez further testified that he had come to suspect that Granillo and Davila were human smugglers. (*Id.*) Officer Benitez testified that his suspicion stemmed from his opinion that the story Granillo and Davila had presented, including their claim that they had picked up two strangers in Hatch and were giving them a ride to Albuquerque, was not credible. (Tr.) at 31:14-32:2, 33:25-34:16.

21.  At some point before any other law enforcement arrived on scene, Officer Benitez had the opportunity to run the identifying information that Gomez-Hernandez had provided through his laptop computer and received negative results. (Tr.) at 34:17-20.

22.  At approximately 1:30 p.m., Sierra County Sheriff's Deputy Brandon Torres arrived at

mile marker 105.  (*Id*.) at 33:13-21.  Less than a minute later, Agent Cesar also arrived at mile marker 105.  (*Id*.)

23.  Agent Cesar testified that, upon arrival at mile marker 105, he made contact with Lopez-Carrasco, who was standing next to Officer Benitez's patrol vehicle.  (Tr.) at 80:3-81:14.  Agent Cesar observed that Lopez-Carrasco was approximately 5'10" tall, weighed approximately 180 lbs., and had a tattoo of a skeleton hand on the side of his face.  (*Id*.) at 81:15-24.  Once Agent Cesar made contact with Lopez-Carrasco, Lopez-Carrasco admitted to Agent Cesar that he was illegally present in the United States.  (*Id*.) at 83:14-84:5.  After conducting a pat-down of Lopez-Carrasco and taking Lopez-Carrasco's belt and shoe laces, Agent Cesar placed Lopez-Carrasco in the rear seat of one of the law enforcement vehicles present at the scene.  (*Id*.) at 84:8-22.

24.  At approximately 1:39 p.m., after placing Lopez-Carrasco in a patrol vehicle, Agent Cesar approached the Ford Focus. Ex. 1 at 01:39:29 p.m.  Agent Cesar testified that he observed Gomez-Hernandez sitting alone in the back seat of the Ford Focus.  (Tr.) at 85:2-86:8.  Agent Cesar testified that, upon initially making contact with Gomez-Hernandez, Gomez-Hernandez claimed that he was legally present in the country, had a social security card, and was married to a United States citizen.  (*Id*.) at 86:19-23.  At approximately 1:40 p.m., Gomez-Hernandez exited the Ford Focus, and Agent Cesar conducted a pat down search of him.  Ex. 1 at 01:39:29 p.m.  Agent Cesar testified that he recovered a Mexican voter registration card from Gomez-Hernandez.  (Tr.) at 87:5-17.  Agent Cesar testified that Gomez-Hernandez ultimately admitted that he was illegally present in the United States.  (*Id*.) at 87:18-88:2.  Agent Cesar further

testified that he had only spoken with Gomez-Hernandez for a few minutes before Gomez-Hernandez admitted that he was illegally present in the United States.  (*Id.*)

### CONCLUSIONS OF LAW

1.  "The Fourth Amendment protects the public from 'unreasonable searches and seizures,' including unreasonable 'investigatory stop[s]' or detentions." *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012) (quoting *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)).  "A traffic stop constitutes a seizure under the Fourth Amendment and, thus, is constitutionally valid only if it is reasonable." *United States v. Gonzales*, 535 F.3d 1174, 1181 (10th Cir. 2008).  "Because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, the principles set forth in *Terry v. Ohio*[, 392 U.S. 1 (1968)],  guide [a court's] determination as to the reasonableness of a traffic stop." *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012) (quotation omitted).

2.  A *Terry* stop that evolves into an unreasonable seizure may lead to the suppression of certain evidence.  *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014).  The exclusionary rule "forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009).  The purpose of the exclusionary rule is to "'safeguard Fourth Amendment rights generally through its deterrent effect.'" *Id.* at 139-40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).  "[A] defendant must show, first, that he was seized in violation of his Fourth Amendment rights and, second, that a factual nexus exists between his unlawful seizure and detention and the challenged evidence." *Mosley*, 743 F.3d at 1323 (quotation omitted).

3.  A court may not suppress identity evidence to the extent a defendant objects to the mere fact that he has been summoned to a hearing, but the court may thereafter apply the

traditional exclusionary rules. *See United States v. Olivares-Rangel*, 458 F.3d 1104 (10th

Cir. 2006) (relying on *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984)).

4.    The Court's analysis of the reasonableness of a *Terry* stop consists of two parts.  First, the

Court assesses whether the officer's stop of the vehicle was "justified at its inception."

*United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (quotation omitted).  Such

justification exists where the officer has "(1) probable cause to believe a traffic violation

has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated

any of the traffic or equipment regulations of the jurisdiction."  *Id.* at 1134.  "Second, if a

traffic stop was justified at its inception, [the Court] determine[s] whether the resulting

detention was reasonably related in scope to the circumstances that justified the stop in the

first place."  *Id.* (quotation omitted).

5.    For purposes of deciding whether an unlawful seizure occurred, "an investigative detention

must be temporary and last no longer than is necessary to effectuate the purpose of the stop.

Similarly, the investigative methods employed should be the least intrusive means

reasonably available to verify or dispel the officer's suspicion in a short period of time."

*Florida v. Royer*, 460 U.S. 491, 500 (1983).  "As a general rule, once an officer's purpose

in a traffic stop based on probable cause or reasonable suspicion is complete, the officer

must let the person go."  *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999).

"However, this general rule is subject to a significant exception permitting an officer to

engage in further questioning unrelated to the initial stop if he has probable cause, the

consent of the suspect, or, at a minimum, a reasonable suspicion of criminal activity."  *Id.*

A court is required to look at the totality of the circumstances when determining whether

the duration of a *Terry* stop is unreasonable.  *United States v. Kitchell*, 653 F.3d 1206, 1221 (10th Cir. 2011).

6.  Courts have not established a "bright line" rule for a time limit on a *Terry* stop.  *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  At some point, an investigative stop becomes a "*de facto*" arrest.  *Id.*  That is, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop."  *Id.*  Courts examine "whether the officers detained the [defendants] longer than necessary to confirm or dispel their suspicions . . . ."  *United States v. Soto-Cervantes*, 138 F.3d 1319, 1323 (10th Cir. 1998).

7.  Several precedential cases address the question of when the duration of a *Terry* stop becomes unreasonable.  In *Rodriguez v. United States*, the Court addressed the question of "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff."  135 S. Ct. 1609, 1614 (2015). Seven or eight minutes passed in that case after the officer's issuance of a traffic warning before a second officer arrived at the scene and the first officer could conduct the dog sniff. *Id.* at 1613.  The Court found this amount of time unacceptable, holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."  *Id.* at 1612.  That is, "[a] seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation."  *Id.* (quotation omitted).

8.  In *Kitchell*, the Court found a forty-one minute investigative detention was not unreasonable given the totality of the circumstances.  653 F.3d 1206.  Even though the officer finished issuing a warning ticket for a traffic violation after twenty-one minutes and

forty-five seconds, the court found both that the time expended addressing the traffic

violation was not unreasonable under the circumstances and that the officer had reasonable

suspicion to prolong the detention. *Id.* at 1218-19. During the investigation of the traffic

violation, the officer performed reasonable tasks including explaining the reason for the

stop, procuring information from each of the three vehicle occupants, examining the rental

car agreement and asking why the renter was not driving the vehicle, and requesting and

waiting for a warrant check on all three individuals. *Id.* at 1218. Further, the court found

that "stark inconsistencies" between the travelers' accounts of their travel plans, their

extreme nervousness, and the fact that they were driving a rental car provided a sufficient

basis for the officer to reasonably suspect criminal activity and to extend the duration of the

stop after completing the traffic warning. *Id.* at 1219.

9.   In *United States v. Soto-Cervantes*, the Court found that an hour and five minute

investigative detention was not unreasonable in a case involving illegal reentry. 138 F.3d

1319, 1324 (10th Cir. 1998). Specifically, the Court found that the officers had reasonable

suspicion to investigate possible drug activity for twenty-three minutes, including searching

the area, performing pat-downs, and requesting identification. *Id.* at 1322-23. Next, even

though the defendant produced a resident alien card, the Court found that it was not

unreasonable for officers to call in Immigration and Naturalization Service ("INS") agents

to determine whether the card was genuine, expending another twenty-two minutes. *Id.* at

1323-24. Finally, the Court determined that the twenty minutes it took the INS agent to

investigate the authenticity of the card was not unreasonable. *Id.* at 1324. In particular, the

Court found that "the INS agent diligently pursued a means of investigation that was likely

to confirm or dispel their suspicions quickly, which made the brief wait constitutionally acceptable." *Id.* (citation omitted).

10.   In *United States v. Cervine*, the Court found that while the initial traffic stop alone did not provide reasonable suspicion to continue the detention and search of Cervine's vehicle, a court could "'look to the knowledge of all the police involved in this criminal investigation, since probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest.'" 347 F.3d 865, 871 (10th Cir. 2003) (quoting *United States v. Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982)).  The Court determined that information the state troopers who performed the stop had received from a Drug Enforcement Administration agent regarding likely drug activity could be imputed to the troopers such that they had reasonable, articulable suspicion to justify detaining the defendant for thirty to fifty minutes for the canine unit to arrive to perform a dog sniff. *Id.* at 872.

11.   Likewise, in *United States v. Mendoza*, the Court found that reasonable suspicion existed to detain the defendant for forty minutes during an investigatory stop in order to obtain a canine unit from fifty miles away to conduct a dog sniff.  468 F.3d 1256, 1260 (10th Cir. 2006).

12.   In *United States v. Rutherford*, the Court found no unreasonable seizure where, due to a computer problem with a license check, an investigatory stop was extended for twenty-five to thirty minutes before officers made an arrest for violation of a municipal ordinance.  824 F.2d 831, 834 (10th Cir. 1987).

13.   *Rodriguez* is distinguishable and not applicable here.  The officer in *Rodriguez* had no reasonable suspicion to extend the duration of the investigatory stop after issuing a traffic

warning.  Here, the officer had not issued a citation to Lopez-Carrasco or Gomez-Hernandez despite his efforts to ascertain their identities.  Rather, this case is similar to *Kitchell* in that both cases involved several vehicle occupants, each of whom the officer questioned, running checks on the occupants, nervous occupants, and inconsistencies or oddities about their travel plans.  653 F.3d at 1218.  Further, the duration of the stop in both cases was approximately forty minutes.  *Id.* at 1206.  This case is also similar to *Soto-Cervantes* in that both cases involved a comparable extension of the stop to verify identification.  138 F.3d at 1323-24 (forty-two minutes).  Likewise, *Cervine*, *Mendoza*, and *Rutherford*, which involved durational extensions of twenty-five to fifty minutes, support the proposition that, if warranted by the totality of the circumstances, the duration of the stop in this case could be found not unreasonable.

14. Based on the totality of circumstances, this Court concludes Officer Benitez had reasonable suspicion to detain Lopez-Carrasco and Gomez-Hernandez.  Specifically, Officer Benitez sought to issue seatbelt citations to Lopez-Carrasco and Gomez-Hernandez, and Officer Benitez required their identities in order to complete those citations.  Lopez-Carrasco's response to Officer Benitez's request for identification was suspect, including his statement that he had identification from Presidio, Texas, and then shortly thereafter that he had no identification whatsoever.  Further, Gomez-Hernandez claimed to have a Colorado identification, but Officer Benitez could not confirm this in a database search.  Without reliable identification information for citing Lopez-Carrasco and Gomez-Hernandez for the seatbelt violations, Officer Benitez could not ensure that a court could locate the offenders.  As the investigatory stop proceeded, Officer Benitez also received odd accounts of how Lopez-Carrasco and Gomez-Hernandez came to be riding in the vehicle and what Granillo

and Davila would be doing in Albuquerque.  In addition, the Tenth Circuit "has held that state law-enforcement officers have the general authority to investigate and make arrests for violations of federal immigration laws."  *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1296 (10th Cir. 1999) (citations omitted).  These circumstances, including Lopez-Carrasco's nervousness and aggressive stance, warranted further investigation to dispel Officer Benitez's suspicion.

15.   The Court finds that the officers diligently pursued their investigation in a manner to confirm or dispel their suspicions reasonably quickly.  The Court determines that the duration required to pursue this investigation was not unreasonable.

16.   Based on the totality of the circumstances, the Court finds there existed reasonable suspicion to extend the duration of the stop, such that the duration was not unreasonable and, therefore, did not violate the Fourth Amendment.  In accordance with the foregoing findings and conclusions of law, the Court denies the motion to suppress evidence of Defendant Gomez-Hernandez's identity derived from the investigatory traffic stop.

IT IS THEREFORE ORDERED

that Gomez-Herandez's Motion to Suppress (Doc. 18) is DENIED.

_____

UNITED STATES DISTRICT JUDGE